**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**GOMEZ VILLALOBOS JHON CARLOS,**

                **Petitioner,**

**v.**

                                         **Civil No. 2:26cv12**

**JEFFREY CRAWFORD, et al.,**

                **Respondents.**

## MEMORANDUM ORDER

On January 8, 2026, Gomez Villalobos Jhon Carlos[1] ("Petitioner") filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2241 alleging that he is being unlawfully detained at the ICA-Farmville Detention Center. ECF No. 1. This Court ordered the Federal Respondents to submit a response to the Petition and informed Petitioner of his right to file a reply. ECF No. 4. The Court thereafter discovered that Petitioner had not received a copy of the Court's Order, and that Order and other case materials were therefore resent to Petitioner. After several weeks, the Court still had not received a reply. The Court then instructed Federal Respondents to file a supplement clarifying various factual details associated with Petitioner's apprehension near the Mexican border in 2022, including the type

---

[1] Based on Petitioner's A-Number, 240-889-454, it appears that his legal name is Jhon Carlos Gomez-Villalobos. See https://acis.eoir.justice.gov/en/.

of release status he was granted at that time, and details associated with his re-detention in Washington D.C. in September of 2025. ECF No. 9.

Respondents timely filed a supplement with several exhibits. ECF No. 10. Shortly thereafter, the Court received a motion for leave to file a late reply, submitted by Petitioner's domestic partner claiming "next friend" status. ECF Nos. 12, 12-3. The Court granted that unopposed motion and considered the exhibits attached thereto. ECF No. 12. Despite these supplemental filings, the parties still had not presented certain immigration documents relevant to Petitioner's 2025 detention, and it remained unclear whether and for how long Petitioner's "humanitarian parole" was extended beyond August of 2022. Accordingly, Respondents were instructed to file a second factual supplement on or before April 10, 2026, and Petitioner was instructed to file a reply on or before April 17, 2026. ECF No. 13. Respondents timely filed their supplement, ECF No. 15, and Petitioner's partner and next friend submitted a letter to the Court with exhibits on April 15, 2026. ECF No. 16. Petitioner has not filed a reply brief, and the time for doing so has expired. For the reasons articulated below, Petitioner's § 2241 Petition is **GRANTED in part** and Respondents are **ORDERED** to provide Petitioner with a standard § 1226(a) bond hearing before an Immigration Judge.

## A. Background

According to Department of Homeland Security ("DHS") records provided by the Federal Respondents, Petitioner, a citizen of Colombia, entered the United States from Mexico on May 30, 2022, near Eagle Pass, Texas. ECF Nos. 10-1, 10-4. Less than an hour after he entered, Petitioner was apprehended by Customs and Border Protection ("CBP") agents and taken into custody. Id. On June 2, 2022, Petitioner was released from custody pursuant to humanitarian parole under a statutory provision that permitted Petitioner to temporarily remain in the United States. Id. One of the DHS records provided by Federal Respondents includes a parole stamp with handwritten notations indicating that the date of parole was June 2, 2022, the "purpose" of parole was "212(d)(5)," and parole would last "Until 8/1/22." ECF No. 10-4. Petitioner's 2022 "I-213" immigration form further indicates that he was paroled "due to detention capacity at the Eagle Pass South Station Sub: Soft-Sided Facility."[2] ECF No. 10-1, at 2.

Consistent with Federal Respondents' assertions, ECF No. 10, at 2, parole under § 212(d)(5) of the Immigration and Nationality Act ("INA"), as codified at 8 U.S.C. § 1182(d)(5), is authorized "only on a case-by-case basis for urgent humanitarian reasons or

---

[2] "A Form I-213 is an official record routinely prepared by an immigration officer as a summary of information obtained at the time of the initial processing of an individual suspected of being an alien unlawfully present in the United States." Yanez-Marquez v. Lynch, 789 F.3d 434, 441 n.4 (4th Cir. 2015) (cleaned up).

significant public benefit." 8 U.S.C. § 1182(d)(5). Although it appears that Petitioner was enrolled in an "Alternatives to Detention (ATD) program" in 2022, ECF No. 10-3, following the Court's request for a second factual supplement, Respondents indicated that "the government did not renew or extend Petitioner's parole," beyond August 1, 2022. ECF No. 14, at 1.

It therefore appears from the record that Petitioner did not have any further interaction with federal immigration authorities between June 2, 2022, and September 12, 2025, when Immigration and Customs Enforcement ("ICE") agents "encountered Petitioner in or near Washington, D.C." ECF No. 6-1 ¶ 7. During such encounter, Petitioner's "identity, nationality, and removability" were confirmed and he "was taken into civil immigration custody." Id. The next day, Petitioner was issued a DHS Notice to Appear ("NTA") indicating that he was subject to removal from the United States pursuant to 212(a)(6)(A)(i) of the INA, as he was "an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General." ECF No. 10-2. Additionally, Petitioner's 2025 "I-213" form indicates that his "current administrative charge" is "212a6Ai – ALIEN PRESENT WITHOUT ADMISSION OR PAROLE." ECF No. 14-1, at 2. That same form purports to recount Petitioner's "Immigration History," but it indicates only that (1) he entered the United States on May 30, 2022,

4

"without being admitted, inspected or paroled" (which is apparently inaccurate) and (2) he was stopped in his vehicle on September 12, 2025, interviewed, and "taken into custody and transported to the WAS Filed Office for processing." Id. Absent from Petitioner's immigration history in the 2025 I-213 was any mention of Petitioner's prior humanitarian parole, nor any indication that his parole had expired or that he was being detained due to the expiration of his parole. Rather, the 2025 I-213 indicates that Petitioner was served with an NTA and "Warrant of Arrest" due to his unlawful presence.[3] Id. at 3.

### B. Discussion

### 1. Interplay between § 1225 and § 1226

The Supreme Court has "long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." Landon v. Plasencia, 459 U.S. 21, 32 (1982). "But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001).

---

[3] The 2025 I-213 also states that Petitioner "has no criminal history." ECF No. 14-1, at 2.

In <u>Romero v. Crawford</u>, No. 3:25cv788, 2026 WL 94634 (E.D. Va. Jan. 13, 2026), and <u>Ponce Vidal v. Crawford</u>, No. 2:26cv134, 2026 WL 561188 (E.D. Va. Feb. 27, 2026), as well as in countless similar cases decided over the last several months, multiple judges of this Court have grappled with the interplay between 8 U.S.C. § 1225(b) and § 1226(a), two statutes governing immigration detention procedures. Historically, § 1225(b) and its <u>mandatory</u> detention provisions applied to noncitizens stopped at or near the border who had yet to establish a "presence" in the United States. In contrast, § 1226(a) and its discretionary bond rules applied to noncitizens who had established a presence in the United States, even if unlawfully.[4]  However, in 2025, the government, first through an internal memo and later through a decision by the Board of Immigration Appeals ("BIA"), <u>Matter of Yajure Hurtado</u>, 29 I&N Dec. 216 (BIA 2025), announced a new interpretation of § 1225(b). Based on this new interpretation, "nearly all noncitizens who entered the United States without inspection" and who are later found anywhere in the United States are subject to <u>mandatory</u> detention without a bond hearing under § 1225(b) regardless of how long they have been physically present. <u>Ortega Miranda v. Bondi</u>,

---

[4] Once arrested on a warrant issued by the Attorney General, a § 1226(a) detainee "may continue to [be] detain[ed]," may be released on a money bond, or may be released on "conditional parole," the equivalent of release on your own recognizance. 8 U.S.C. § 1226(a)(1), (2). Release under § 1226(a), including "conditional parole," is distinct from humanitarian parole and allows a noncitizen to await the resolution of their immigration case outside of immigration detention.

No. 3:25cv769, 2026 WL 287179, at *3 (E.D. Va. Feb. 3, 2026) (citation omitted).

The undersigned has repeatedly adopted the emerging majority view that noncitizens demonstrating a long-term presence in the United States are entitled to a discretionary bond hearing under § 1226(a).[5] See, e.g., Ponce Vidal, 2026 WL 561188, at *2-3 (ordering a § 1226(a) bond hearing and noting that the petitioner, who "resided in the United States for at least a decade" before he was detained by ICE, "unquestionably ha[d] due process rights"); Romero, 2026 WL 94634, at *5-6 (explaining that the government's interpretation of § 1225 "would raise constitutional problems which the Supreme Court is yet to address"); Aroca v. Mason, No. 2:26cv57, 2026 WL 357872, at *19 (S.D.W. Va. Feb. 9, 2026) (finding that the petitioner's interpretation of § 1225 and § 1226 "align[ed] with longstanding constitutional principles" recognizing that "[n]oncitizens physically present in the United States, whether lawfully or unlawfully, are entitled to greater due process protections than those stopped at the border"). In reaching this conclusion, the undersigned has relied on the Supreme Court's longstanding guidance that the "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time

---

[5] Federal judges do not unanimously agree on the issue, as evidenced by a circuit split. Compare Buenrostro-Mendez v. Bondi, 166 F.4th 494, 502 (5th Cir. 2026), and Avila v. Bondi, No. 25-3248, 2026 WL 819258, at *6 (8th Cir. Mar. 25, 2026), with Cunha v. Freden, No. 25-3141, 2026 WL 1146044, at *23 (2d Cir. Apr. 28, 2026); see also Castanon-Nava v. U.S. Dep't of Homeland Sec., 161 F.4th 1048, 1061 (7th Cir. 2025).

7

and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (citation omitted).

**2. Impact of Petitioner's Parole under § 1182(d)(5)**

Unlike Romero, Ponce Vidal, and similar cases, here, the discovery of Petitioner's unlawful physical presence in the United States did not first occur years after he unlawfully entered. Rather, Petitioner was first detained by CBP agents very close to the southern border less than an hour after he entered the United States. Petitioner was released onto humanitarian parole three days later pursuant to the authority of the Attorney General to "temporarily parole aliens detained under §§ 1225(b)(1) and (b)(2)" for "urgent humanitarian reasons or significant public benefit." Jennings v. Rodriguez, 583 U.S. 281, 300 (2018) (quoting 8 U.S.C. § 1182(d)(5)(A)).

Though temporary physical presence in the United States is tolerated when humanitarian parole is granted, it comes with a key "reservation of rights by the Government": The Government is authorized to continue to "treat the non-citizen" on parole "as if stopped at the border." Martinez v. Hyde, 792 F. Supp. 3d 211, 215-16 (D. Mass. 2025) (quoting Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 139 (2020)); see 8 U.S.C. § 1182(d)(5)(A) (explaining that humanitarian parole "shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland

8

Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States"). Accordingly, "even those paroled elsewhere in the country for years pending removal . . . are [fictively] treated for due process purposes as if stopped at the border" when the government later considers their "rights regarding admission." Thuraissigiam, 591 U.S. at 139 (cleaned up). According to the Federal Respondents, because Petitioner was previously paroled under § 1182(d)(5), he remained subject to § 1225(b)'s mandatory detention provisions after the termination of his parole. ECF No. 6, at 1-2.

Petitioner's current detention arguably has earmarks of both § 1225(b), because Petitioner was previously apprehended near the border and paroled under § 1182(d)(5), and § 1226(a), because Petitioner was "discovered" unlawfully residing in the United States years after his temporary permission to be present expired. Neither party points to controlling precedent addressing such hybrid factual scenario.

The Court notes its familiarity with, and consideration of, the BIA's ruling in Matter of Q. Li, 29 I&N Dec. 66 (BIA 2025). But Q. Li is factually distinguishable.[6]

---

[6] Q. Li is also not binding on this Court. See Hasan v. Crawford, 800 F. Supp. 3d 641, 657 n.11 (E.D. Va. 2025) ("[T]his Court owes little deference to the BIA's interpretation of the INA." (citing Loper Bright Enters. v.

In Q. Li, as in the instant case, a noncitizen was placed on humanitarian parole after an encounter near the southern border in 2022.  Id. at 67.  As "a condition of the parole grant, the [noncitizen] was required to regularly report to a DHS field office."  Id.  "When the [noncitizen] reported to a DHS field office for a scheduled appointment" in November of 2024, she was taken "into custody and issued . . . a notice to appear for removal proceedings and a notice of custody determination."  Id.  The BIA concluded that when the noncitizen's parole was terminated, she "returned to [mandatory] custody under section 235(b) pending the completion of removal proceedings."  Id. at 69-70 (citing 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e)(2)(i)).  Importantly, the BIA further concluded that the noncitizen's grant of parole "was automatically terminated when she was served with a notice to appear," a finding acknowledging the noncitizen's uninterrupted parole from 2022 through her re-detention in 2024.  Id. at 70.

In contrast, here, under the facts as presented by Federal Respondents, Petitioner's parole ended more than two and a half years before he was encountered in Washington, D.C.  ECF No. 14, at 1.  Respondents do not point to any steps the government took during this multi-year period to enforce the end of Petitioner's

---

Raimondo, 603 U.S. 369, 412 (2024))); Velazquez v. Raycraft, No. 25cv13675, 2026 WL 447417, at *5 (E.D. Mich. Feb. 17, 2026) (explaining that the court is not "bound by the BIA's recent decision in Matter of Q. Li, 29 I&N Dec. 66 (BIA 2025), which applies § 1225(b)(2)(A)").

parole, to return Petitioner to custody, to initiate Petitioner's removal proceedings, or even to place a notation in Petitioner's immigration records documenting the expiration of his parole. In fact, when Petitioner was encountered by immigration officials and arrested more than two years after his parole had expired, he was issued a warrant and charged with being unlawfully present without having been admitted or paroled; no mention was made in his civil charges to past or present humanitarian parole. ECF Nos. 10-2, 14-2. Similarly, Petitioner's "immigration history" on his 2025 I-213 is silent as to his status as a prior parolee. ECF No. 14-1. Therefore, unlike in Q. Li, Petitioner had no legal status for over two and a half years, during which he established a long-term, albeit unlawful, presence in the United States. As explained in further detail below, these events cannot be reasonably construed as a valid continuation of the "legal fiction" that Petitioner was stopped at the border.

First, although controlling precedent clearly establishes that the legal fiction of non-presence as applicable to admission rights can continue for several years, Thuraissigiam, 591 U.S. at 139, some district courts have concluded that Thuraissigiam does not directly address whether this fiction extends to the right to be free from detention without the minimal process of a detention hearing. See Torres v. Hermosillo, No. 2:25cv2687, 2026 WL 145715, at *4 (W.D. Wash. Jan. 20, 2026) (explaining that the "entry

11

fiction" applied by the Supreme Court in <u>Thuraissigiam</u> applied only to noncitizens' rights regarding <u>admission</u> and that "the Supreme Court has never applied the entry fiction doctrine . . . to constitutionally justify the <u>detention</u> of a person living freely, for years, within the United States" (citations omitted)). To the extent that <u>Thuraissigiam</u> does not extend to detention procedures, this Court finds that Petitioner's multi-year presence in the United States entitles him to the same constitutional rights as other noncitizens first discovered years after their entry. <u>See</u> <u>Rincon v. Hyde</u>, 810 F. Supp. 3d 101, 113 (D. Mass. 2025) (ordering a bond hearing after observing that "to apply the entry fiction doctrine to [a petitioner that was on humanitarian parole for more than three years] is to set aside the plain meaning of the Fifth Amendment altogether"); <u>Strunin v. Garcia</u>, No. 5:26cv106, 2026 WL 958952, at *8 (S.D. Tex. Mar. 3, 2026) ("Pretending that Petitioner never entered the United States [during the years he was a parolee] not only subordinates fact to fiction, it disregards the plain meaning of the Due Process Clause, which promises its protection to every 'person' within the United States." (quoting <u>Torres</u>, 2026 WL 145715, at *4)); <u>Singh v. Bondi</u>, No. SA-26-CA-00541-XR, 2026 WL 752457, at *8 (W.D. Tex. Mar. 16, 2026) ("Noncitizens who have lived with relative freedom in the United States for extended periods — unlike those detained in immigration processing centers at the border — cannot reasonably

be deemed never to have been 'here.'"); see also Zadvydas, 533 U.S. at 693 (discussing the due process protections that emerge "once an alien enters the country," even if their presence is both unlawful and temporary).

Second, even accepting that the "legal fiction" of non-presence recognized in Thuraissigiam extends to detention procedures as applied in Q. Li, this Court finds that such fiction ends when a petitioner has enjoyed years of post-parole presence. Importantly, unlike in Q. Li, where the noncitizen's parole continued until she was re-detained, Petitioner's brief two-month parole period was followed by more than two and a half years of unauthorized but actual presence. As recently explained by another district judge in similar circumstances:

> Petitioner is not subject to the entry fiction despite his previous parole into the United States. As this Court has repeatedly stated, Petitioner's parole expired and he continued to remain in the United States for over a year before he was detained. As a result, Petitioner had a similar status to any other undocumented immigrant who entered the United States without inspection and without DHS having any clue as to their whereabouts.

Rodriguez v. Fields, No. CV 26-117, 2026 WL 1078101, at *11 (E.D. Ky. Apr. 21, 2026); see Escalona v. Noem, No. 2:26cv769, 2026 WL 885025, at *1 (M.D. Fla. Apr. 1, 2026) (explaining in a case where the petitioner overstayed his parole by six months that "[a]pplying § 1225(b)(2) to noncitizens years after they were paroled into the country does not comport with the policy justification for treating noncitizens in the country differently than those seeking entry").

13

This conclusion is especially true in a case where, upon a petitioner's arrest, he is not treated by immigration officials as a parolee and notified of his re-detention under § 1225(b), but instead, is charged by warrant with being <u>unlawfully present</u> in the United States with no reference whatsoever to his status as a <u>former</u> parolee. Cf. <u>F.M.S. v. Lowe</u>, No. 1:25cv2061, 2026 WL 1113769, at *4 (M.D. Pa. Apr. 24, 2026) (analyzing whether the petitioner had been properly notified of the termination of his parole and noting that "Respondents point to no evidence that any of the cited documents mention Petitioner's parole or its revocation"). Respondents fail to "explain how it is possible, much less appropriate, to recharacterize the basis for [Petitioner's] detention after issuing h[is] Notice to Appear." <u>Silva v. Figueroa</u>, No. CV-25-4015, 2025 WL 4076899, at *1 (D. Ariz. Nov. 18, 2025) (noting that the noncitizen's Notice to Appear initiated removal proceedings based on her purported presence in the United States "without having been admitted or paroled," as contrasted with her status as "an arriving alien").

Accordingly, like a noncitizen who unlawfully enters the United States and is present for years prior to being detected, here, after Petitioner's short-term parole ended, Petitioner established a <u>multi-year</u> presence prior to being "rediscovered." See <u>Rodriguez-Acurio v. Almodovar</u>, 811 F. Supp. 3d 274, 307 (E.D.N.Y. 2025) ("[I]t would be illogical to find that [the

14

petitioner] is still in the process of 'arriving' in the United States when she has been continuously residing in the United States for more than three years after the expiration of her humanitarian parole."). Precedent thus supports the finding that Petitioner's multi-year unapproved presence affords him some basic procedural due process rights, Zadvydas, 533 U.S. at 693, which here take the form of a full and fair hearing under § 1226(a) to determine the propriety of his continued detention.[7]

## C. Conclusion

For the reasons outlined above, Petitioner's § 2241 Petition is **GRANTED, in part.** ECF No. 1. Respondents are **ORDERED** to provide Petitioner with **a standard § 1226(a) bond hearing** before an Immigration Judge **on or before May 6, 2026.** In line with due process requirements, Petitioner is entitled to an opportunity to be heard in a meaningful manner at the bond hearing and to a ruling premised on his own case-specific circumstances, including any risk of flight as balanced against his unique family circumstances involving the need to care for his disabled son. Cf. Mendez Trigueros v. Guadian, No. 1:26cv205, slip op. at 7 (E.D. Va. Feb.

---

[7] The Court acknowledges that the above analysis could be perceived as creating perverse incentives for noncitizens to disregard immigration rules and overstay their parole. However, it is helpful to reiterate that the discussion herein focuses on the right to procedural due process. This Court's ruling does not suggest that Petitioner has improved his long-term prospects of remaining in the United States by overstaying his parole. To the contrary, he has presumably harmed them. However, as part of the promise and protections afforded by the United States Constitution, procedural due process rights apply to "all 'persons' within the United States, including [noncitizens]" unlawfully present. Zadvydas, 533 U.S. at 693.

15

18, 2026) (ordering that the petitioner be released unless he received a _second_ § 1226(a) bond hearing that was "constitutionally compliant").

Respondents are **ORDERED** to file a status report with this Court within **three (3) days** of the bond hearing, stating whether Petitioner has been granted bond, and, if his request for bond was denied, the case-specific reasons given by the Immigration Judge for that denial.

The Clerk is **DIRECTED** to enter partial judgment in Petitioner's favor pursuant to Federal Rule of Civil Procedure 58, forward copies of this Memorandum Order to Petitioner and to counsel for Respondents, and to administratively close this action.[8]

**IT IS SO ORDERED.**

/s/ _____

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
April 29 , 2026

---

[8] Although the case will be administratively closed, the Court retains jurisdiction to ensure compliance with this Order.

16